**DAVID H. ANGELI**, OSB No. 020244
 david@angelilaw.com
**KRISTEN L. TRANETZKI**, OSB. No. 115730
 kristen@angelilaw.com
Angeli Ungar Law Group LLC
121 SW Morrison Street, Suite 400
Portland, OR  97204
Telephone:  (503) 954-2232
Facsimile:  (503) 227-0880

**COURTNEY W. ANGELI**, OSB No. 941765
 courtney@baaslaw.com
**ROBIN BOWERFIND**, OSB No. 035949
 robin@baaslaw.com
Buchanan Angeli Altschul & Sullivan LLP
321 SW 4th Avenue, Suite 600
Portland, OR  97204
Telephone:  (503) 974-5015
Facsimile:  (971) 230-0337

Attorneys for Plaintiff John Doe

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **JOHN DOE**, | Case No.: _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **Wrongful Expulsion (Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.); Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; Unfair/Deceptive Trade Practices; Estoppel and Reliance; Defamation; Malicious Use of Process; Abuse of Process; Intentional Interference with Contractual Relations** |
| **THE REED INSTITUTE** (aka, Reed College) and **JANE ROE**, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

PAGE 1 – COMPLAINT

Plaintiff John Doe ("John"), by and through his undersigned attorneys, David H. Angeli and Kristen L. Tranetzki of Angeli Ungar Law Group LLC and Courtney Angeli and Robin Bowerfind of Buchanan Angeli Altschul & Sullivan LLP, respectfully alleges as follows against defendants The Reed Institute (a/k/a Reed College) ("Reed") and Jane Roe ("Jane"):[1]

## THE NATURE OF THIS ACTION

1.      In 2013, Jane and John were students at Reed. At that time, both were over the age of 18.

2.      On July 25, 2013, after they had been dating seriously for approximately ten months, Jane and John engaged in fully consensual group sexual activity with a woman who had recently graduated from Reed, but who was still attending classes there ("AM").

3.      That sexual activity occurred after all three—John, Jane, and AM—knowingly and voluntarily consumed drugs and alcohol.

4.      This was not John and Jane's first sexual activity together.

5.      This was also not John and Jane's first group sexual activity together with a third party. John and Jane had previously participated together in group sexual encounters after consuming drugs and alcohol.

6.      After July 25, 2013, John and Jane continued to date and engage in consensual sexual activities for approximately three months. In October 2013, John broke up with Jane.

7.      In March 2014, eight months after the July 25 group sex, and only after John started dating Jane's friend, Jane claimed—for the first time—to Reed's Community Safety

---

[1] Contemporaneously with this Complaint, Plaintiff has filed a motion to proceed pseudonymously. Although Jane Roe engaged in illegal and tortious conduct, a pseudonym is also used to protect her identity. *See, e.g., Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1068 (9th Cir. 2000); *Doe 130 v. Archdiocese of Portland in Oregon*, No. CV. 07-1732-PK, 2008 WL 656021, at *1 (D. Or. Mar. 6, 2008).

PAGE 2 – COMPLAINT

Division ("Community Safety") that (among other things) she had not consented to the group sex on July 25, 2013.

8.      Jane's accusations were malicious and false, brought in bad faith, and intended to retaliate against John for dating her friend, rather than to vindicate legitimate or honest concerns.

9.      Reed—concerned by years of reports criticizing the school for its permissive culture and purportedly weak sexual assault policies—responded to Jane's accusations with a series of arbitrary, discriminatory, and illegal actions directed toward a predetermined outcome: John's expulsion from Reed.

10.     When Reed ultimately imposed that draconian sanction on John, Reed also made clear its intent to disclose the facts and circumstances surrounding John's expulsion to anyone who might inquire about his status with or departure from Reed, including any university to which John might apply or any future employer seeking a copy of his transcript.  Specifically, Reed informed John, in writing, that "a record of this case will be retained in [John's] disciplinary record and released to third parties in response to appropriate requests for his disciplinary information."

11.     Reed took those actions despite sworn testimony from AM—the third participant in the July 25 group sex—that Jane was not only "fully aware of what was going on," but also that she "was totally into it, . . . enthusiastic and seemed to be really enjoying herself."

12.     Two days after the group sex, Jane told AM that she "had enjoyed the experience."

13.     Another female student ("ML") who was present in the same residence on July 25, 2013 similarly swore under oath that Jane repeatedly (but unsuccessfully) encouraged ML to

PAGE 3 – COMPLAINT

join in the group sexual activity, and that Jane did not appear intoxicated or impaired at the time of that solicitation.

14.     In August 2013, Jane expressed interest to John—in writing—in having another group sexual encounter with John and AM and also identified another female student as a "sex goal" for the upcoming semester.

15.     Despite the clear evidence that the events of July 25, 2013 were fully consensual, Reed expelled John anyway, and vowed to label him as a rapist to anyone who might ask or to whom his transcript was released.

16.     Reed's decision to expel John followed an amateurish and biased investigation by Community Safety. That investigation violated John's rights and Reed's own policies and procedures in numerous ways, as detailed below.

17.     Similarly, Reed's Sexual Misconduct Board ("SMB"), charged with adjudicating the allegations against John, failed to comply with federal law and/or with Reed's policies and procedures.

18.     The SMB's faulty and biased decision was upheld through a flawed appeals process, the outcome of which—John's expulsion—was preordained.

19.     Reed promises its students that the school will fairly and impartially investigate and adjudicate allegations of sexual misconduct. However, as a practical matter, Reed's policies and procedures do not permit students accused of sexual misconduct to obtain fair hearings before competent or impartial tribunals, and it failed in this instance to provide the equitable resolution of complaints the law requires.

20.     Furthermore, Reed applies its policies and procedures in a discriminatory manner to male students because of gender.

PAGE 4 – COMPLAINT

21.    In John's case, Reed's policies and procedures prevented him from receiving a fair hearing and resulted in the imposition of the most severe sanction available to Reed, which will have dramatic repercussions on him for the rest of his life.

22.    Moreover, even though John, Jane, and AM participated equally in the activities on July 25, 2013, Reed investigated and disciplined only John—the only male in the group—taking no disciplinary action whatsoever against either of the female participants.

23.    During the SMB hearing and appeal process, Reed also deprived John of basic due process and equal protection rights guaranteed by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and its implementing regulations, and by Reed's own stated policies and procedures.  For example:

   a.  Federal law requires schools to provide "a balanced and fair process that provides the same opportunities to both parties."  The law also requires that complainants and alleged perpetrators be provided with "an equal opportunity to present relevant witnesses and evidence."  Reed violated those mandates by instructing John in advance of the hearing that he was forbidden from "attempting to contact *any* party or witness involved in the proceedings about this case," thereby preventing him from conducting any reasonable factual investigation or ensuring that key witnesses—including AM and ML—would appear to testify at his hearing.  The SMB compounded that problem by doing nothing prior to the hearing to compel those witnesses' attendance.

   b.  Because the SMB failed to compel the attendance of key witnesses like AM—an actual participant in the activity at issue—the evidence at the hearing consisted almost exclusively of "he said, she said" testimony.  There was no physical, medical, or other corroborating evidence presented.  And the SMB forbade John from presenting evidence of Jane's biases and motives to lie.  The severe limitations placed on John's ability to present evidence in his defense, combined with the "preponderance of the evidence" standard utilized, resulted in a virtually pre-determined finding in Jane's favor.

   c.  The United States Department of Education "discourages schools from allowing students to serve on hearing boards in cases involving allegations of sexual violence."  Nevertheless, in John's case, three of the five members of the SMB were students.

   d.  Reed's perceived need to respond to public criticism of its permissive culture and history of mishandling claims of sexual assault—reflected by its hiring of a former federal prosecutor to serve as its President—created an environment that

PAGE 5 – COMPLAINT

made it impossible for Reed's administration to equitably and impartially review the SMB's factual findings and the propriety of the penalty it imposed.

e.   Community Safety's investigation, the SMB's process and findings, the decision to expel John, the denial of John's appeal, and Reed's policies and procedures violated Reed's contractual obligations to John and were applied against John in a discriminatory manner on account of his gender.

f.   Although John himself was previously a victim of sexual assault (by a female Reed student) and a physical assault (by Jane), Reed denied him the same protections afforded female complainants.  Reed discouraged John from bringing any formal charges himself and Reed never sanctioned the females who assaulted him.

g.   Despite the serious nature of the charges and the severity of the resulting sanctions, Reed prohibits students accused of sexual wrongdoing from receiving assistance from legal counsel during hearings.  Compounding that deficiency in Reed's policies, John—a college student with no legal training—was given a mere eight days in which to prepare for his hearing, the results of which could (and did) have a life-changing impact.

24.   As a result of Reed's and Jane's tortious and illegal conduct, John's academic future, career prospects, earning potential, and reputation have been severely and irreparably damaged.  The significant time, effort, and expense that John devoted to obtaining a college education at Reed and fostering relationships in the Reed community are lost.  And Reed has literally labeled him a rapist, a slander that it has promised to repeat to anyone who asks.

25.   For these reasons, John brings this action to obtain relief based on Reed's clear violations of Title IX and applicable Oregon law.  He seeks to recover damages for, *inter alia*, Reed's breach of contract arising out of the school's failure to follow federal law and its own policies and procedures regarding student disciplinary actions, and its wanton failure to abide by its duty and obligation to adhere to such policies and procedures in a good-faith, professional, unbiased manner.  John is entitled to have the disciplinary decision vacated, to an award of damages for Reed's and Jane's false, malicious, and injurious actions and statements, and to his attorneys' fees and costs incurred in pursuing this action.

## THE PARTIES

26.     Plaintiff John Doe (hereinafter "John") resides in New York.  John was a full-time student at Reed College from approximately September 2010 until his expulsion from Reed in April 2014.

27.     Upon information and belief, defendant Jane Roe (hereinafter "Jane") resides in Oregon.  During the events described herein, Jane was a student at Reed.  She is presently a full-time student at Reed.

28.     Defendant Reed Institute (aka Reed College) (hereinafter "Reed") is a private, liberal arts college and a domestic non-profit corporation incorporated in Oregon, with its principal place of business located at 3203 Southeast Woodstock Boulevard, Portland, Oregon 97202.

29.     Reed is among the most elite liberal arts colleges in the United States.  In 2006, Newsweek magazine named Reed as one of twenty-five "New Ivies," listing it among "the nation's elite colleges."  In 2012, Newsweek ranked Reed the 15th "most rigorous" college in the nation.  According to self-published statistics, Reed has produced the second-highest number of Rhodes Scholars of any liberal arts college.  A high percentage of its graduates go on to earn PhDs and other postgraduate degrees.

30.     At all times material hereto, Reed acted by and through its agents, servants, employees, and representatives, who were acting in the course and scope of their respective agencies or employment and/or in the promotion of Reed's business, mission and/or affairs.

## JURISDICTION AND VENUE

31.     Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331.

PAGE 7 – COMPLAINT

32.     Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

33.     Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

34.     Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in this judicial district because a substantial part of the events and omissions giving rise to the claims set forth below occurred in this district.

## FACTUAL BACKGROUND

### 2010:  John Doe Accepts Reed's Offer to Attend the School on Terms Described in Reed's "Guidebook."

35.     Prior to his enrollment at Reed in 2010, John was a highly accomplished high school student attending a college preparatory program.  John spent his junior year of high school abroad in Beijing, China, where he attended a Chinese public school and lived with a Chinese family.  Due to his impressive Mandarin language skills, John received a score of 5 on his Chinese Language Advanced Placement exam.

36.     John's performance on college admission examinations was also impressive.  On his SATs, John scored a 720 in Critical Reading (97th percentile), 670 in Math (89th percentile), and 680 in Writing (94th percentile).

37.     John was also involved in numerous high school extracurricular activities, including drama and theatrical productions, baseball, tennis, lacrosse, and wrestling.  He also did volunteer work mentoring elementary students, among other things.

EXHIBIT A
Page 8 of 58

38.     John applied to and was accepted by a number of highly competitive colleges and universities, including Reed.

39.     After careful consideration, John made a conscious and informed decision to continue his educational pursuits at Reed, and began classes for the 2010-2011 academic year. John selected Reed in part because of its unique educational philosophy, its progressive reputation, its academic rigor, its location, and the fact that Reed claimed to have the second highest rate of graduates who went on to receive graduate degrees, which was John's ultimate educational goal.

40.     Reed provided John with a copy of its Guidebook (the "Guidebook"), which is compiled by the office of the Dean of the Faculty.

41.     The Guidebook contains certain of the college's policies and procedures, including Reed's "Community Policies and Practices," which are comprised of such policies as the "Honor Principle" and the "Discriminatory Harassment and Sexual Misconduct Policy," among others.

42.     These documents are also readily available on Reed's website, which also contains other policies, regulations, promises, and representations made by Reed to its students.

43.     In consideration for his tuition and attendance at Reed, John received and was given assurances and promises by Reed that it would follow and comply with the numerous policies and procedures adopted and put forth by Reed, including those contained in the Guidebook.

44.     John relied on these assurances and promises when accepting Reed's offer of admission.

45.     The Guidebook includes a "Notice of Nondiscrimination" that warrants:

PAGE 9 – COMPLAINT

Reed College does not discriminate on the basis of race, color, national origin, religion, sex, sexual orientation, gender identity, gender expression, age, marital status, military status, veteran status, genetic information, physical or mental disability, pregnancy, status as a parent, family relationship, or on the basis of any other category protected by law.

46.    Reed's Discriminatory Harassment and Sexual Misconduct Policy (the "DHSM Policy") similarly warrants and promises a commitment to nondiscrimination.

47.    The "Sexual Assault Prevention and Response at Reed" policy, also contained in the Guidebook, warrants and represents that "Reed's approach to prevention and response includes four key elements":

- "Preventing sexual violence through education and action";
- "Providing support for survivors";
- "Investigating incidents swiftly and adjudicating them fairly"; and
- "Protecting the community from sexual predators."

**September 2012:  John Doe and Jane Roe Begin Dating.**

48.    John and Jane met at an on-campus Reed party in September 2012 while they were both students at Reed.  After several casual sexual encounters, they began dating exclusively in November 2012.  John and Jane regularly spent their free time together and often went on dates both on and off campus.  During their relationship, John and Jane typically engaged in sexual intercourse several times per week and spent most nights together in John's apartment.

49.    John and Jane also visited each other during school breaks.  During winter break 2012-2013, John spent two weeks with Jane and her family in Berlin, Germany, where the family was living at the time.  Jane spent spring break 2013 with John and his family in West Palm Beach, Florida.  In June 2013, Jane joined John's family on a vacation in South Carolina.  When

PAGE 10 – COMPLAINT

EXHIBIT A
Page 10 of 58

they were apart, John and Jane corresponded regularly by electronic mail, text, telephone, and video chat.

50.    While they were dating, John and Jane also frequently experimented together with drugs, alcohol, and sex.  Such experimentation is common among Reed students.

51.    These acts between John and Jane were always consensual, with each party knowingly and voluntarily partaking.  Both John and Jane contributed the alcohol and drugs that they ingested, as both had easy access to drugs and alcohol at Reed.

52.    Reed's permissive culture for drug and alcohol experimentation is well documented.

### July 25, 2013:  John and Jane Willingly Engage in Group Sex with AM.

53.    On July 25, 2013, approximately ten months into their relationship, Jane went to John's off-campus apartment, where several friends had gathered for a party.  Most of the attendees were Reed students.  It is common for Reed students to drink alcohol and ingest recreational drugs at parties hosted by other Reed students.

54.    At this party, Jane knowingly and voluntarily consumed some alcohol.  Jane also knowingly and willingly ingested a small dose of MDMA, a drug of the phenethylamine and amphetamine classes of drugs.  MDMA is known as a "party drug," consumed primarily for its euphoric and empathogenic effects.

55.    Jane had knowingly and voluntarily consumed alcohol and MDMA (among other illegal drugs) on numerous other occasions.

56.    At this party, John also knowingly and voluntarily consumed some alcohol and willingly ingested a small dose of MDMA.

PAGE 11 – COMPLAINT

57.     One of the other party attendees, a female who had just graduated from Reed but who was still attending classes there (AM), had also knowingly and voluntarily ingested alcohol and drugs during the party.

58.     At some point during the party, Jane, John, and AM went upstairs to John's bedroom to engage in group sexual activities.  All three willingly and knowingly went upstairs to John's bedroom for this purpose.

59.     After John, Jane, and AM went upstairs to engage in sexual activities, both John and Jane yelled to another one of their friends at the residence, Reed student ML, asking her to join in the group sexual activity.  ML declined the invitation.

60.     During their sexual activities, John, Jane, and AM each knowingly and willingly shared an additional small amount of MDMA, each ingesting an equal portion.

61.     Jane and AM engaged in sexual activities with each other, while John kissed both of them.  Jane repeatedly complimented AM on her appearance, telling her that she was "hot." Jane was a very active partner in the sexual encounter.  Jane repeatedly asked AM, in a provocative fashion, whether she liked the sexual acts she was performing on her.  Jane also asked John if he wanted to have intercourse with AM.

62.     The majority of the sexual activities occurred between Jane and AM.  Jane initiated most of the sexual activity, and John was a more limited participant.  He mainly kissed Jane and AM and engaged in light sexual touching.

63.     Jane was not incapacitated or unwilling to participate in the group sexual activities.  To the contrary, she was fully aware of, consented to, and actively participated in all aspects of those activities.  At no point during the group sexual activities did Jane ever tell John

or AM to stop.  She did not exhibit any apprehension, fear, or hesitancy.  Rather, Jane was an enthusiastic participant.

64.     When John, Jane, and AM took a break from their group sexual activity, Jane again invited ML to join in the activity.  ML again declined to participate.

65.     Following the break, John, Jane, and AM reinitiated sexual activities.  The encounter involved multiple sessions of intercourse, which lasted until the next morning.

66.     When the sexual activity ended, John, Jane, and AM cuddled in bed and talked for several hours.  They specifically discussed their desire to have another group sexual activity together because this one had gone so well.

**July to October 2013:  John and Jane Continue Their Relationship and Jane Makes Clear Her Desire to Engage in Additional Group Sex, Including with AM.**

67.     Jane did not seek medical or psychological treatment following this sexual encounter.  Nor did she report the sexual encounter to any law enforcement bodies or school authorities at the time.  She never reported the sexual encounter to the police.

68.     Following the July 25, 2013 group sex, Jane continued to date John as she had before.  John and Jane continued their intimate sexual relationship and their regular use of drugs and alcohol.  During this period, Jane spoke of and wrote of her desire to find additional opportunities for group sex with John.

69.     For instance, on August 23, 2014, Jane wrote to John on Facebook about her desire to have group sex with another female Reed student, who was "sooooo hot omg," according to Jane.  Jane messaged John that "[w]e have to make her a sex goal this upcoming semester."

70.     John and Jane also specifically communicated about having sex again with AM. For instance, on August 5, 2013, from 7:36 pm PDT through 8:02 pm PDT, John and Jane

PAGE 13 – COMPLAINT

exchanged several instant messages over Facebook about the possibility of another group sexual encounter with AM.

71.     During this Facebook chat, John inquired whether Jane would be interested in participating in sex with two additional partners (AM and someone else, in addition to John). Although Jane responded that she would be interested in a "foursome," she stated she did not want to have sex with the fourth person proposed that night, because she was "fat," "gross," and "vile."  Jane did not state or insinuate that the last sexual encounter with AM was nonconsensual or otherwise unwanted, or that she did not want to have sex with AM again.

72.     John respected Jane's desire not to participate in the group sexual activity he suggested on August 5, 2014.

### October 2013:  John Doe and Jane Roe End Their Relationship After Jane Physically Assaults John.

73.     John and Jane ended their relationship in October 2013.

74.     Over time, their relationship had become infused with jealousy.  Each accused the other of being unfaithful.  Jane repeatedly threatened to end the relationship in an attempt to coerce John to act in certain ways, *e.g.*, to avoid talking with other women.  John and Jane had verbal altercations as a result of the jealousy.  Typical of 19 and 20 year olds, each engaged in overheated and hurtful name-calling and other rhetoric directed at the other.

75.     Jane also repeatedly invaded John's privacy by, among other things, stealing his cell phone and reviewing his text messages with other women and blocking other women's phone numbers without his permission or knowledge.

76.     On one occasion, Jane went so far as to handcuff herself to a friend and force the friend to bring her to John's apartment, after John had sent text messages to Jane stating that he did not want to see her.

PAGE 14 – COMPLAINT

77.     Jane also physically struck John on several occasions.  John has never physically harmed Jane.

78.     On or about October 26, 2013, John and Jane had a verbal altercation on campus after they had been drinking alcohol together.  Jane escalated the argument by punching John in the face with a closed fist, causing a contusion and bleeding on John's mouth.  John tried to walk away from Jane, but Jane grabbed onto John and created a scene.  Their mutual friends separated them, and John went to his apartment.

79.     Upon information and belief, to preempt a report that Jane feared John would make about her violence toward him, Jane reported the incident to Community Safety, alleging that John had somehow caused her to attack him.  But, in Jane's communications with Community Safety surrounding this incident of her aggression and her communications about her relationship with John, Jane never once suggested that John had ever physically touched her in any way without her consent, much less that he had raped her three months earlier (*i.e.*, on July 25, 2013).

80.     Reed's investigation into the October 26 incident concluded that Jane had indeed "struck [John] in the jaw with her fist, causing him to bleed from his mouth and to report that he had loose teeth."  Nevertheless, despite no evidence of physical aggression by John, Reed responded by instituting a *mutual* no-contact order between John and Jane.  Because Jane is female and John is male, Reed did not take any disciplinary action against Jane for striking John in the face with a closed fist so hard that she drew blood and knocked two teeth loose.

81.     Following this incident, John ended his relationship with Jane.

PAGE 15 – COMPLAINT

**March 2014: Eight Months after the July 25 Group Sex with AM—and Only after John Starts Dating Jane's Friend—Jane Complains to Reed about a Sex Tape and, for the First Time, Accuses John of Sexual Assault in Connection with the July 25 Group Sex.**

82.     In early spring 2014, John began casually dating another Reed student who was a mutual friend of his and Jane's. The couple tried to hide their relationship from Jane, so as not to upset her and cause hard feelings. However, Jane found out about John's new relationship and got angry. Jane and her friends started to ignore John's new girlfriend, with whom they had previously been friendly.

83.     Around that same time, Jane also heard a rumor that John had shown someone a sexually explicit video that Jane and John had knowingly and voluntarily made while they were dating.

84.     Jane was angry that John was dating her friend. She was also purportedly angry about the rumor of John showing the video to someone. Jane decided to retaliate against John.

85.     On March 8, 2014, Jane sent an email to Gary Granger ("Granger"), Reed's Director of Community Safety, requesting a meeting and alleging that John had violated the no-contact order that had been put in place after Jane punched John in the face. Jane informed Granger that she had heard a rumor that John had shown a sexually explicit video of her to at least one other person without her consent.

86.     Jane's March 8, 2014 email to Granger made no mention of the July 25, 2013 group sex with AM. Nor did it allege that John had ever assaulted Jane in any way.

87.     Jane and Granger met on March 11, 2014. During that meeting, Jane described the rumor she heard about the video. Jane made clear that she did not know to whom the video had allegedly been shown, but claimed to have heard about it through a friend who refused to provide names. She also did not know when the video had allegedly been shown.

88.     After describing her concerns relating to the video, Jane, for the first time, falsely claimed to Community Safety that John had sexually assaulted her nearly eight months earlier, on the night of July 25, 2013.  Granger invited Rowan Frost ("Dean Frost"), the Assistant Dean of Sexual Assault Prevention and Response, to join the meeting at that time.

89.     Jane falsely claimed to Granger and Dean Frost that, on July 25, 2013, she had been coerced into having sex with John and AM while under the influence of MDMA.

90.     Granger told Jane that she could report her allegations to the police.  Jane said she did not want to make a police report.

**Reed's Policies and Procedures Governing Disciplinary Proceedings.**

91.     Reed's Guidebook sets forth the school's policies and procedures for investigating and adjudicating alleged disciplinary violations, including alleged violations of Reed's sexual misconduct policies.

92.     In July 2013, when the alleged incident occurred, the applicable policy was Reed's "Sexual Harassment Policy."  That policy was effective until September 20, 2013.

93.     Reed later adopted the DHSM Policy, which was effective starting September 20, 2013.  That policy was in effect at the time Jane brought her allegations to Granger and when she filed her complaint with the SMB.

94.     The DHSM Policy "details and explicitly prohibits specific forms of harassment and encourages the reporting of these prohibited behaviors."  It further provides that:

> This policy is required by, and is as a whole intended to be consistent with, Title
> IX of the Education Amendments of 1972, 34 CFR Part 106, and any other
> applicable law or regulation that prohibits discrimination on the basis of any
> legally protected category in the educational programs or activities of colleges
> and universities, in employment, or in any other relationship which is governed by
> law. Reed College also acknowledges and intends to comply with its legal
> responsibilities under federal or Oregon law, including the reporting
> responsibilities of the Clery Act, 34 CFR 668.46. If any provisions of this policy

PAGE 17 – COMPLAINT

are contrary to or interfere with any applicable law, that law will supersede the inconsistent policy provisions.

95.     The DHSM Policy adopts a "reasonable person" standard, which it defines as a "hypothetical person who is level-headed and rational, aware of community norms, and not under the influence of a judgment-impairing substance." In terms of consent, it suggests that "parties may use the reasonable person standard when assessing whether a reasonable person in the same context as the respondent would believe that they had consent in that context."

96.     The DHSM Policy provides that reports of sexual misconduct may be made to Reed's Title IX Coordinator (or designee thereof) or to Community Safety.

97.     According to the DHSM Policy, reporting and filing a formal complaint are two distinct concepts. Depending on the nature of a report, the Title IX Coordinator (or designee thereof) will determine the type of investigation to follow. Investigations will not necessarily result in disciplinary action. Investigations may result in the initiation of a formal complaint by the Title IX Coordinator (or designee).

98.     The DHSM Policy provides that students who are unsure as to whether to make a formal complaint may undertake confidential preliminary discussions of possible violations with a counselor in Reed's Health & Counseling Center. The DHSM Policy does not recommend or even suggest that the student may or should seek counseling or advice from Community Safety as to whether or not to file a formal complaint.

99.     Formal complaints may be made to the appropriate body for resolving the complaint, or to the Title IX Coordinator, who is to forward the complaint as necessary. Complaints made by students are received by the Student Judicial Board or by the SMB and are handled in accordance with Reed's Judicial Board Code.

100.     The DHSM Policy also provides that the above-described procedures supplement, and do not replace, other remedies for acts that constitute violations of the policy.  It further provides that students have the option at all times to file a criminal compliant with law enforcement and/or to seek a civil remedy, in addition to or instead of invoking Reed's procedures.

101.     Reed's "Title IX Coordinator Resource Page" further details the procedures to be followed from the time of an initial report of sexual assault, sexual exploitation, or sexual harassment, through the investigation and preparation of the investigation report.  Those procedures provide that "[t]he Respondent is to be notified of the complaint within two (2) business days, or as quickly as practicable.  Notification will in most cases be the responsibility of the investigator."

102.     Reed's policies provide that the Title IX Coordinator or any other member of Reed's staff is empowered to take action whether or not a student formally complains.

### Bias in Reed's Sexual Misconduct Policy.

103.     Reed's "Sexual Assault Prevention and Response" policy is facially biased in that it refers to those alleging sexual misconduct as "survivors."

104.     Use of the word "survivor," as opposed to a value-neutral word such as "accuser" or "complainant," inescapably presupposes the guilt of the accused from the outset, prior to the commencement of any adjudicative proceedings.  This language demonstrates an institutional climate of bias against the accused (who are typically male) and effectively shifts the burden to the accused to prove his innocence rather than requiring the accuser to prove her allegations.

105.     Reed's "Sexual Assault Prevention and Response" policy also provides for certain support for "survivors" that is not equally afforded to those who are accused.

PAGE 19 – COMPLAINT

**March 2014:  Reed Fails to Abide by the Requirement to Notify John of Jane's Allegations.**

106.    Pursuant to Reed's published procedures, Granger was required to notify John of Jane's March 11, 2014 complaint "within two (2) business days, or as quickly as is practicable."

107.    Granger did not inform John of Jane's allegations as required.  Instead, he and Dean Frost entered into an impermissible agreement with Jane to delay notifying John so that Jane would be better positioned "to deal with negative fallout" while completing her examinations.  Jane also wanted to enjoy her spring break.  Granger and Dean Frost, in violation of Reed's procedures, "agreed that [they] would engage[] in aspects of the investigation that could be done without contacting [John Doe] first" so Jane could finish her exams and enjoy her spring break.

108.    Granger commenced his investigation on March 11, 2014, but did not inform John of those allegations until April 3, 2014—more than *twenty* days later than Reed's procedures required—when Granger emailed John asking him to meet to discuss a complaint that had been made against him.  John was thus deprived of those critical three weeks to which he was entitled, during which time he could have investigated and prepared his defense to Jane's allegations.  All the while, Granger was secretly conducting his own investigation.

**Granger Initially Focuses His Investigation on Jane's Allegations Relating to the Video, but Turns up Nothing.**

109.    Granger, as Director of Community Safety, investigated Jane's allegations.  Granger's investigation initially focused on the allegations relating to the video, which were initially the centerpiece of Jane's complaint.

110.    On March 12, 2014, the day after he met with Jane, Granger interviewed Jane's friend who had purportedly "heard" from others that John showed them the sexually explicit video of John and Jane.  This friend would only say that "two students" had told her that John

PAGE 20 – COMPLAINT

had shown them the video.  The friend did not identify the alleged witnesses and declined to tell Granger "about how the video was displayed or the context" or "anything specific."  (At the hearing, Jane's friend changed her story to say that "at least" one student told her that they had seen the video.)

111.    The same day, Granger requested a search of Reed's "computing resources and information associated with [John Doe] that could contain the kinds of video files or image files that [Jane Roe] referenced."  Granger also contacted the Portland Police Bureau ("PPB") on March 16, 2014 to discuss the video.

112.    The investigation of the video incident revealed nothing.  Reed's Chief Information Officer found "no evidence of any video or image files present that depicted [Jane Roe]."  The names of the students who allegedly saw the video never surfaced.  PPB informed Granger that, even if a showing were confirmed, no criminal statute had been violated.

113.    When John was finally informed about the investigation, he readily cooperated with Granger to locate and delete any copies of videos showing him and/or Jane engaged in sexual acts that remained in his possession.  John never posted any such video to any internet or intranet site.

**Granger Turns His Attention to the Allegations Relating to the July 25 Group Sex and Conducts a Grossly Inadequate and Biased Investigation.**

114.    Granger's investigation into Jane's belated allegations of sexual misconduct relating to the July 25 group sex was woefully incomplete and biased against John from the very beginning.  Among other failings, Granger did not interview key witnesses and neglected to pursue obvious lines of inquiry.

115.    Cases of alleged sexual misconduct between acquaintances or couples are often difficult to investigate because typically, only the accused and the accuser are in the room during

PAGE 21 – COMPLAINT

the key events.  But in this case, Granger knew after meeting with Jane on March 11, 2014 that a

third person, AM, had been in the room and had *participated* in the sexual activity.  Inexplicably,

however, Granger failed to contact AM until April 3, 2014, three weeks after his investigation

began, three days after he urged Jane to file her formal complaint "as soon as possible," and one

day after Jane filed her formal complaint.  Granger had obviously concluded that John was guilty

without talking with the neutral eyewitness who had participated in the sexual activity.

116.    On April 3, 2014, Granger finally sent an email to AM requesting that she provide

a statement about the incident.

117.    During her April 4, 2014 interview, AM's immediate reaction to Granger's

questioning was that it did not "seem like a case of sexual misconduct."  Like John, AM

described how she, John, and Jane went upstairs together for the purpose of having sex and then

"had sex for several hours."  She reported no hesitation on Jane's part, stating that Jane "seemed

to have been enjoying the encounter at the time."  AM refuted Jane's allegation that John had

told AM that Jane would need to "be convinced" to have sex with them.

118.    During the interview, AM showed Granger her description of the encounter and a

Facebook message she sent the next day, "commenting about having enjoyed [being] with" John

and Jane.  Neither document was made part of the record or Granger's investigative file.

119.    AM also told Granger that she talked with Jane a couple of days after the sexual

encounter and Jane said that she "had enjoyed the experience."

120.    Stunningly, in his final investigative report, Granger summarized AM's

eyewitness testimony—which refuted every significant aspect of Jane's story—by stating merely

that "[AM] confirmed that the incident took place, but reported not being aware of [Jane] having

refused consent or not being a willing participant."

PAGE 22 – COMPLAINT

121.    Granger failed altogether to interview another critical witness to the events of July 25:  ML, the female Reed student whom Jane twice invited to join in the group sexual activity that night.  Even though Granger knew that his investigative report was to be submitted to the SMB by April 9, 2014, he did not email ML until April 8 to request a meeting, and then only sent one email to her.  Receiving no response to that email, Granger never again attempted to contact ML.  He never tried to reach her by telephone or find her on campus.

122.  Despite his awareness of facts directly refuting Jane's allegations against John, Granger never interviewed *anyone* regarding Jane's motives for initiating her complaint or questioned whether she fabricated the allegations.

123.  Additionally, Granger failed to ask obvious and important questions in the interviews that he did conduct.  For instance, he never confronted Jane with the statements made by John or AM, nor did he ask her to explain the material discrepancies between her story and that testimony.

124.  Despite clear evidence that Jane was lying about the sexual assault—including AM's statements that corroborated John's account in all material respects—Granger did not investigate whether Jane had made a false complaint against John.

125.  Granger did not act as an impartial investigator.  Instead, he acted as an advocate for Jane.

### April 2, 2014:  At Granger's Urging, Jane Files a
### Formal Complaint with the Sexual Misconduct Board.

126.  On March 31, 2014, Granger encouraged Jane to file her report as "soon as possible."  As a result, Jane submitted her formal complaint to the SMB on April 2, 2014, the day before Granger completed his investigation.

127.  In her formal complaint, Jane alleged that John violated the DHSM "in two ways": by (1) "shar[ing] sexually explicit video footage of me without my consent and thereby sexually exploit[ing] me" and (2) by "engag[ing] in unwanted sexual behavior with me when I was incapacitated and therefore unable to give consent."  She described the July 25th sexual encounter as a "sexual assault."

128.  Jane also alleged that John violated the No Retaliation Clause of the No Contact Order by showing the sexually explicit video without her consent.

129.  Finally, Jane's formal complaint to the SMB contained a new allegation not previously reported to Community Safety during the thirteen months in which she dated John or during the five months since they broke up, including in any of her many communications with Community Safety during that period:  Jane now claimed that her prior relationship with John was "emotionally and verbally abusive" and thus violated the Honor Principle "by causing [her] to endure unnecessary trauma and suffering."

### April 9, 2014:  Granger Prepares an Inaccurate, Incomplete, and Misleading Investigative Report.

130.  Reed's Title IX "Resource Page" promises that the investigator will "prepare an investigative report that summarizes all of the pertinent information and facts."

131.  Granger's investigative report of Jane's allegations (the "Investigative Report") violated Reed's procedures because it impermissibly included opinion rather than "facts," did not include all of the "pertinent information," and impermissibly characterized the evidence.

132.  For instance, Granger summarized AM's interview in a highly misleading fashion as described earlier.

133.  The Investigative Report did not acknowledge John and Jane's history of consensual group sexual encounters.  It nowhere disclosed that Jane stayed in the sexual

relationship with John for three months after the alleged incident, and that she expressed interest during that time in engaging in additional group sexual encounters, including sex with AM.

134.  The Investigative Report failed to disclose that Jane had waited eight months before reporting the incident, and that she had communicated at least twice with Community Safety during those months without ever mentioning any alleged sexual assault.  It also failed to discuss Jane's potential motives for bringing the complaint or for fabricating her allegations.

135.  The Investigative Report impermissibly included a "credibility determination," unfavorable to John, which was wholly Granger's personal opinion and not sanctioned by Reed's policies.

**Although Three Students Inarguably Ingested Roughly the Same Amount of Drugs and Alcohol and Engaged in the Same Group Sexual Activity on July 25, 2013, Reed Failed to Initiate any Disciplinary Proceedings against the Two Female Participants.**

136.  Three individuals—John, Jane, and AM—ingested roughly the same volume of drugs and alcohol on July 25, 2013.  All three then participated in hours of group sexual activity together.

137.  Reed elected not to initiate a formal complaint against AM because she is a woman who engaged in sexual activities with another woman.  Reed's charging decision and its different treatment of John was impermissibly based on gender.

138.  Reed also failed to initiate disciplinary proceedings against Jane, even though all three participants had ingested roughly the same volume of intoxicants and engaged in sexual activity.  If Reed concluded that Jane was incapable of consenting to sexual activity because she had ingested intoxicants, it should have concluded that John and AM were similarly incapable of consenting to sexual activity.  Reed initiated disciplinary proceedings only against John because he is male, and not against Jane or AM because they are female.

PAGE 25 – COMPLAINT

**Policies and Procedures Governing Reed's Sexual Misconduct Board.**

139.  The Guidebook provides that formal complaints of sexual misconduct made by students against current or former students are heard and decided by the SMB.  The Guidebook defines "sexual misconduct" as sexual assault, sexual harassment, and any other form of dishonorable conduct of a sexual nature.

140.  Reed's Judicial Board Code sets forth the policies and procedures that govern the SMB hearing.  According to the Guidebook, the SMB has "the responsibility to investigate complaints, determine facts, and recommend action appropriate to the circumstances of the case and the ethos of an educational institution."

141.  The SMB consists of five staff (non-student, non-faculty) members, together with the nine full-time student members of the Student Judicial Board.  Each complaint is heard by a panel of five members of the SMB.

142.  Reed represented and agreed with John, through its published Guidebook, that its SMB members would be adequately trained in matters relating to sexual misconduct, as well as in the adjudication of violations of the Honor Principle.

143.  According to the Guidebook, the SMB, except where specified, uses the procedures of the Judicial Board, which are as follows:

- Upon receipt of the complaint, the Judicial Board shall meet to discuss the specific procedures for handling the case.
- The Judicial Board Chair shall announce the meetings and hearings of the Judicial Board to the Judicial Board members at least two days before such meetings or hearings.  The procedural aide should provide each person requested to appear before the board with such a request at least two days before s/he is scheduled to appear.
- The procedural aide should inform the respondent of the grounds on which s/he has allegedly committed a violation by providing the respondent with a copy of the written complaint at least four days before the hearing.
- The Judicial Board reserves the right to set reasonable limits on the length of hearings, testimony, and opening and closing statements.

PAGE 26 – COMPLAINT

- The Judicial Board, not individual parties, is responsible for calling witnesses to a hearing.

- The Judicial Board reserves the right to decline to accept the testimony of any witness who lacks direct knowledge of the alleged violation or who is redundant of another witness.

- At the conclusion of a case, the five member panel hearing the case shall deliberate in closed meetings to arrive at the Judicial Board's determinations of fact and recommendations.

- In deciding if a violation has occurred, four of the five voting members of the Judicial Board need only determine that the Judicial Board has evidence that has more convincing force than that opposed to it in order to come to a decision.

- If the Judicial Board finds a respondent to have committed a violation, it may recommend sanctions the nature and severity of which shall be appropriate to the violation, its circumstances, and the history of offenses by the respondent.

- All findings of fact and recommendations of the Judicial Board must be ratified by at least four of the five Judicial Board members hearing the case. The findings and recommendations, together with the case file, shall be forwarded to the President or his or her designee for a decision.

### April 2014: The Sexual Misconduct Board Places Restrictions on John Doe that Prevent Him from Preparing an Adequate Defense.

144. Reed did not provide John, a college junior with no legal training, an adequate opportunity to prepare or present a defense.

145. John was notified via email on April 4, 2014, by the "Procedural Aide" assigned by the SMB, that "the Board has received a letter from [Jane Roe] regarding your involvement in an incident that [Jane Roe] believes constituted a violation of the Honor Principle. The Board has decided to hear the case at 9:00 am on Saturday, April 12, 2014."

146. There was no indication that John posed any continuing threat that might otherwise have required such swift action—the incident had occurred nine months earlier. Furthermore, John's accuser had requested that no official action be taken immediately so she could prepare for exams and enjoy spring break.

147.  Despite the fact that John faced severe sanctions that could have a life-changing impact for him, the April 4 email did not encourage John to seek legal advice.  Instead, he was told he could contact "school counselors" should he "need personal support."

148.  The April 4 email emphasized the "confidentiality" of the proceedings.  John was informed that he could contact mental health practitioners for guidance ("counselors, therapists, psychiatrists, etc.") but was not told that he could contact his parents or a lawyer about the pending case.  Reed did not separately notify his parents of the allegations.

149.  The April 4 email instructed John to identify to the SMB his potential witnesses within five days, by April 9, 2014.

150.  The April 4 email contained conflicting and confusing information as to John's ability to contact witnesses.  Reed instructed John to "not contact witnesses directly about the case itself"; however, Reed stated he could still "discuss the events and experiences that led to the case with them."  The April 4 email then made clear that "*the Board expects that neither you nor the complainant(s) will attempt to contact any party or witness involved in the proceedings about the case.*  If you have any contact regarding this case with a complainant or witness, on their initiation or your own, please notify [the Board] immediately."  (Emphasis added.)

151.  John reasonably understood this directive to be a "gag order" preventing him from contacting his own witnesses (or anyone else who might participate in the SMB hearing) about the case.  Accordingly, he did not contact any witnesses to determine whether they could and/or would testify on his behalf.

**The Hearing Process Violated John Doe's Rights and Reed's Own Procedures.**

152.  The SMB hearing process did not adequately safeguard John's rights and violated federal law and Reed's own procedures.

PAGE 28 – COMPLAINT

153.  The SMB panel hearing John's case consisted of three students, Reed's Performing Arts Librarian, and Reed's Associate Registrar.  Those individuals acted simultaneously as investigator, prosecutor, judge, and jury.  They lacked the necessary training, experience, skills, and (in the case of the students) maturity—as well as adequate time to prepare—to perform these critical functions at John's hearing.

154.  John was not permitted to be represented or accompanied by counsel in the SMB hearing.

155.  Jane was permitted to bring a student, RF, to support her during the SMB hearing.  At that time, RF was a member of the SMB and participated in regular meetings with the SMB panel that heard John's case.

156.  The SMB had fewer than ten days to prepare for the hearing, which was not sufficient to adequately review and understand the Investigative Report; to review requests for witnesses to determine who would participate in the hearing; to review evidence submitted in advance by the parties; and to prepare questions for the complainant, respondent, and all of their witnesses.

157.  Although the Guidebook mandates a preponderance of the evidence standard in a student disciplinary hearing involving allegations of sexual assault, it does not state whether the complainant or the respondent bears the burden of proof.  The Guidebook also does not set clear guidelines for determining the admissibility of evidence.

158.  The SMB impermissibly placed the burden of proof on John to prove his innocence.

159.  Reed empowered the SMB to compel students to testify at SMB hearings.  Nevertheless, the SMB failed to take the necessary steps to obtain testimony from the two most

PAGE 29 – COMPLAINT

important witnesses in the case: AM and ML, both of whom were female eyewitnesses to critical events on the main night in question.

160. Notwithstanding Reed's promise that the SMB "is responsible for calling witnesses to a hearing," the SMB took no action whatsoever to compel AM's or ML's attendance. As a result, John was effectively denied the opportunity to present the testimony of any witness on his behalf, including the two most important eyewitnesses to the events in question, one of whom actually *participated* in the sexual encounter at the center of the case.

161. The SMB did not allow John to ask any questions of Jane or any other witness. Rather, the SMB required John to submit proposed questions to the SMB, who decided which, if any, of the questions to ask. The SMB refused to ask 80 to 90 percent of the cross-examination questions that John propounded, despite their obvious relevance. John was never given the opportunity to explain the importance of the questions to his defense.

162. When John attempted to proffer evidence of Jane's obvious biases and motives, the SMB absolutely precluded him from doing so, improperly deeming such evidence "irrelevant."

163. The SMB accepted Jane's testimony, without challenging her to explain the obvious discrepancies between her testimony and other reliable evidence in the record.

164. With respect to the allegations that John showed a sexually explicit video without Jane's consent, the witness(es) who allegedly saw the tape never came forward to the SMB, nor have he/she/they ever been identified. John was never presented with the name(s) of the anonymous witness(es), and he never had an opportunity to confront his anonymous accuser(s).

**May 5, 2014: The Sexual Misconduct Board Issues a Faulty Decision That Was Based on Impermissible Gender Bias.**

165. Although John was provided only eight days to prepare for his hearing, the SMB

took more than a month to render its decision.  Reed informed John by letter dated May 5, 2014

that the SMB concluded that he had violated the Sexual Harassment Policy (effective until

September 2013), the DHSM Policy (effective after September 2013), and the Reed Honor

Principle.  According to the letter, the SMB examined four issues:  "(1) Did [John] sexually

assault [Jane] on July 25th, 2013? (2) Did [John] sexually exploit [Jane] in January 2014? (3) Did

[John] violate the No Retaliation clause of the No Contact order between himself and [Jane]? and

(4) Were [John]'s actions during his relationship with [Jane] sufficient to constitute an abusive

relationship dynamic?"  The SMB answered yes to all four questions and imposed sanctions.

Demonstrating its careless attitude, the SMB misspelled John's last name no less than five times

in its findings of violations.

166.  Because John was effectively precluded from presenting a defense at his hearing,

the SMB adopted Jane's allegations wholesale and ruled in her favor.  For a number of reasons,

this decision was faulty, arbitrary, and capricious.

167.  For example, in deciding that John violated Reed's policies by showing the

sexually explicit video without Jane's consent, the SMB impermissibly relied solely on double

hearsay testimony and failed even to identify, much less to give John an opportunity to confront,

his anonymous accuser(s).

168.  In deciding that John sexually assaulted Jane on July 25, 2013, the SMB reached

its conclusion without hearing the critical testimony of AM, who actually participated in the

hours-long group sex, or ML, the other female student who Jane twice urged to join in that

activity while it was occurring.

169.  The SMB published factual "findings" that ignored virtually all of the mitigating

and contradictory evidence discussed herein.

PAGE 31 – COMPLAINT

170.  The SMB also impermissibly applied a biased standard that made the male solely responsible for wrongdoing when all of the involved parties had ingested roughly equal amounts of drugs and alcohol.  Reed took no disciplinary action whatsoever against the two female participants, Jane and AM.

171.  The gender bias implicit in the SMB's decision-making is evidenced by the fact that Reed and the SMB failed to pursue disciplinary actions against AM, even though Jane specifically testified in the hearing that AM had initiated the sexual contact amongst the three of them.

172.  In deciding that John violated Reed's policies by being emotionally and verbally abusive to Jane, the SMB failed to consider Jane's own conduct in the relationship, which was physically, emotionally, and verbally abusive to John.

173.  In terms of sanctions, the SMB recommended that John be expelled immediately from Reed College, that he be excluded from campus and from all Reed College events, and that a record of the disciplinary proceedings be included in John's disciplinary file and released in accordance with school policy.

174.  Reed's decision to punish John so severely was motivated in part by the fact that John, a male, defended himself.  In a May 5, 2014 letter, Reed's Dean of Student Services Mike Brody (who was assigned by Reed to review the SMB decision) concluded that John's sanctions were appropriate because he "expressed neither contrition nor regret" as purportedly evidenced by the fact that he "accused the complainant and witnesses of fabricating testimony."  In other words, Reed chose to punish John so severely in part because he maintained his innocence. Dean Brody did not attend the SMB hearing and made these sweeping statements about John's demeanor, attitude, and motivations without meeting with or speaking with John.

PAGE 32 – COMPLAINT

**Reed's Policies and Procedures Governing the Appeals Process.**

175.  Reed's Guidebook provides that, in all cases, the complainant and the respondent shall have the opportunity to appeal the SMB's decision to the Appeals Board, which consists of three students (including the President of the Student Body and a Student Senator who is not a member of the Judicial Board), two members of the faculty, and the Chair of the Community Affairs Committee as an ex-officio, non-voting member.

176.  Following the Appeals Board's decision, one final appeal may be made to the President of the College, so long as it is received no later than ten working days after the decision on a previous appeal made to another body.

**The Appeals Process Was Faulty and Biased and Resulted in an
Arbitrary and Capricious Decision.**

177.  Following the May 5, 2014 letter announcing the SMB's decision, John filed a timely appeal.  He had requested and was granted a brief extension of time for his appeal.

178.  John appealed the Board's decision on each of the three permissible grounds under Reed's Judicial Board Code:  (1) that the sanctions were excessively severe; (2) that numerous procedural errors significantly affected the outcome of the hearing; and (3) that new or newly discovered evidence was of a character that would have significantly affected the outcome of the hearing and the decisions that followed.

179.  By letter dated July 8, 2014, the Appeals Board denied John's appeal.

180.  The Appeals Board stated that "the sanction of expulsion is one of the sanctions available to the SMB, and it is neither unprecedented nor exceptional."

181.  The Appeals Board also claimed that "the sanctions were appropriately justified with reference to the findings of fact and violations."  In fact, none of the three violations found

PAGE 33 – COMPLAINT

by the SMB was supported by sufficient evidence and, in any event, none properly warranted the draconian sanction of expulsion.

182.  The Appeals Board improperly discounted the serious concerns John raised concerning the manner in which the investigation and hearing were conducted.  Although John's appellate brief catalogued numerous errors, the Appeals Board summarily and wrongly concluded that no error occurred that would have changed the outcome of the hearing.

183.  The Appeals Board ignored altogether the additional grounds that John raised in his appeal, including that:  (1) the SMB's findings relating to the video were based solely on anonymous hearsay testimony; and (2) the SMB interrupted John's testimony and limited that testimony in a way that was not done with respect to any other witness.  The Appeals Board failed even to consider these grounds in its decision.

184.  On August 4, 2014, John submitted a timely final appeal to President Kroger.  That final appeal catalogued the Appeals Board's errors.  It also reiterated that:  (1) the sanctions were excessively severe; (2) numerous procedural errors significantly affected the outcome of the hearing; and (3) new or newly discovered evidence was of a character that would have significantly affected the outcome of the hearing and the decisions that followed.

185.  The "new evidence" that John included as part of his appeal consisted of two signed sworn declarations: one from AM, who participated in the July 25, 2013 group sexual activity; and one from ML, whom Jane had twice invited to join in that activity.  These were the two witnesses whose attendance the SMB had failed to ensure at John's hearing, and whose testimony had therefore not been considered in assessing either John's culpability or the appropriate sanctions if he were found culpable.

PAGE 34 – COMPLAINT

186.  In her sworn declaration, AM made clear that Jane was a willing and enthusiastic participant in the July 25 sexual encounter, and that Jane had inquired as to whether AM was enjoying the sexual acts that Jane was performing on her.  It was clear to AM that none of the participants was incapacitated and that consent was given by all participants.  AM also recalled Jane telling her several days later that she "had enjoyed the experience."

187.  In her sworn declaration, ML made clear that Jane twice propositioned her to join in the July 25 group sexual activity.  ML understood Jane to be a willing participant who consented to the sexual encounter and who did not appear to be incapacitated in any way.  Jane had previously experimented with other drugs in ML's presence.

188.  In her sworn declaration, ML also spoke to the volatility of John and Jane's relationship and the role that Jane played in antagonizing and abusing John.  ML testified that Jane was devastated to learn that John was dating Jane's friend, and ML believed that Jane would be likely to lash out against John by falsely initiating disciplinary proceedings against him.

189.  By letter dated August 29, 2014, President Kroger informed the parties that, in light of the "new evidence" John provided in his final appeal, Jane would be given a period of 60 days to submit "any additional information or evidence she believes is relevant to the case prior to final disposition."  Neither the Guidebook nor any other Reed policy provides for such an extraordinary accommodation for an accuser.  Furthermore, the 60-day response period afforded to Jane, a female, contrasts sharply with the mere eight days that John, a male, was given to prepare for an entire disciplinary hearing, and the ten days allotted to him to prepare his appeal.

190.  In this same letter, President Kroger explained that, regardless of whether Jane provided new information during that 60-day response period, President Kroger would not

PAGE 35 – COMPLAINT

accept any additional information from John, thereby preemptively denying John the opportunity to respond to whatever Jane might submit.

191.  Jane did not respond to President Kroger's letter and did not submit any new information or evidence.  She did not contest the sworn declarations by AM and ML in any way, thereby implicitly conceding their accuracy and validity.

192.  By letter dated October 30, 2014, President Kroger notified the parties that more than 60 days had passed without Jane submitting any additional information or evidence and that he would make a decision based on the totality of the record.

193.  Despite Jane's failure to challenge or rebut the allegations contained in the sworn declarations from the two female eyewitnesses, President Kroger affirmed the original sanction against John by letter dated November 11, 2014.  The decision was arbitrary and capricious and based on an inaccurate understanding of the facts, mischaracterization of critical evidence, and reliance on evidence outside the record.  Further, the decision was improper because it went beyond the issues presented for appeal and adopted new reasons for upholding John's expulsion that were contrary to determinations made by the SMB in its original proceeding.

194.  President Kroger based his decision, in part, on impermissible conclusions related to John's alleged drug activity, namely that he distributed drugs on campus.  This was not one of the alleged violations identified in Jane's formal SMB complaint nor was it addressed or considered by the SMB during the hearing.  In fact, John was expressly instructed by the SMB (as they interrupted him to cut off his testimony) that he was not to discuss the alleged conduct, as it was not "relevant" to the hearing.  Moreover, the SMB's findings of fact and violation, as well as the sanctions imposed, did not relate to this alleged drug activity.  President Kroger's *sua sponte* decision during the final appeal to justify John's sanctions on these new grounds was thus

PAGE 36 – COMPLAINT

arbitrary and capricious, based on information for which John was not permitted to present a defense, and in violation of Reed's policies which do not permit findings of violations not contained in the complaint.

195.  Additionally, although both AM and ML forcefully and clearly corroborated John's testimony that Jane had consented, President Kroger mischaracterized and unfairly discredited their sworn declarations, notwithstanding Jane's failure to rebut that testimony.

196.  President Kroger's and Reed's decision to discipline John was impermissibly gender-biased.  For example, President Kroger concluded that AM and ML, the two female eyewitnesses who provided sworn declarations, "were apparently on MDMA at the time of the events, and thus their ability to judge the degree of impairment of [Jane Roe] at that time is subject to question."  But even though John had ingested roughly equivalent amounts of intoxicants, President Kroger and Reed determined that John *was* able to judge the degree of Jane's impairment to the point that he should have concluded that Jane was unable to provide consent.

197.  President Kroger and Reed made that finding notwithstanding Jane's two invitations to ML to participate in the sexual activity, her active participation in that activity with AM and John for hours, and the fact *both* eyewitnesses—AM and ML—perceived that Jane showed no outward appearance of intoxication or inability to consent.

198.  Another example of President Kroger's and Reed's gender bias is their conclusion that any consent Jane may have given to the July 25 sexual activity was "not valid" because she had consumed MDMA and alcohol.  But if Jane was unable to consent to the sexual activity, John—who had consumed roughly the same amount of intoxicants—was, by definition, also unable to consent.  But Reed disciplined only John.  Reed did not take any disciplinary action

PAGE 37 – COMPLAINT

against Jane or AM for engaging in sexual activity with John without his consent. Nor did Reed take any action against Jane or AM for engaging in nonconsensual sexual activity with each other. Instead, Reed took disciplinary action—the most severe available—only against John, the sole male in the group.

199. Particularly in light of sharp public criticism of Reed appearing in the press and elsewhere, President Kroger lacked the objectivity and impartiality necessary to provide John with a fair and equitable review of the SMB's findings and the severe penalties it imposed. John's fate was preordained; Reed and President Kroger needed to appear to the public, as well as to Reed's students and their parents, that Reed was "tough" on sexual assault allegations brought by female students against male students, notwithstanding compelling evidence establishing that Jane's core allegations were fabricated.

### John Doe's Own Sexual Assault at Reed.

200. John was the victim of an earlier sexual assault by another Reed student. In June 2012, after celebrating his birthday with friends, John returned to his residence. He awoke later that night to a female Reed student trying to remove his pants. The female student then started to perform oral sex on John and tried to engage in further sexual activities despite John's repeated protests and incapacitated state. The student eventually left. John awoke the next morning naked from the waist down.

201. John later reported the incident to Community Safety. A Community Safety officer ("George") instructed John to report the incident directly to Granger, but Granger was off duty. Displaying no sense of urgency, George told John that he would set up a meeting between John and Granger for the following week.

202. When John finally met with Granger, Granger interrogated him and treated him as a target of the investigation, rather than a complainant or victim. Granger did not ensure the

PAGE 38 – COMPLAINT

attendance of Dean Frost (or a similarly situated administrator) at their meeting, as he had when Jane brought her allegations of sexual assault to him.

203.  In sharp contrast to his instruction to Jane to file her complaint against John "as soon as possible," Granger actively discouraged John from filing a formal case against the female student.  Despite the evidence that substantiated John's claims, John was informed by Reed that the school would close the investigation without action.

### John's Academic Career, Professional Future, and Reputation Have Been Irreparably Damaged by Reed's Illegal and Tortious Conduct.

204.  As a result of Reed's unlawful actions, John's reputation has been irreparably damaged, his academic career has been destroyed, and his economic future has been severely compromised.

205.  Upon information and belief, the vast majority of colleges and universities have transfer and admission policies that explicitly forbid the acceptance of students who have been expelled from a college or university for sexual misconduct.

206.  As a result of Reed's illegal actions, John's ability and plans to pursue undergraduate and graduate degrees have been severely compromised.

207.  As a result of Reed's illegal actions, John was deprived of the value of the substantial financial resources invested in his Reed education.  Reed also wrongfully deprived John of his ability to complete his degree requirements.

208.  Without appropriate redress, the unfair and illegal outcome of the SMB hearing and its appeal will continue to cause irreparable damage to John.

### First Cause of Action

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Against Defendant Reed)

209.  John Doe incorporates and realleges paragraphs 1 through 208 as if set forth fully

PAGE 39 – COMPLAINT

herein.

210.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

211.  Upon information and belief, Reed receives federal funding through various means including, without limitation, student loans provided to Reed students directly by the federal government and through other funds furnished by the federal government.

212.  Regulations implementing Title IX require that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.  To assist schools with implementing those regulations, the Office of Civil Rights ("OCR") of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations.  The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved . . . ."  Pursuant to the Revised Sexual Harassment Guidance, "due process" must include, among other things, "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence."

213.  Schools also have an obligation under Title IX to ensure that all employees involved in sexual harassment proceedings (including proceedings involving "alleged sexual assaults") have "adequate training as to what conduct constitutes sexual harassment."

214.  Reed has deprived John, on the basis of his sex, of his Title IX rights to due

process and equal protection through the improper administration, and/or the existence, in its

current state, of Reed's Guidebook and other applicable policies and procedures.

### Count 1 - Selective Enforcement

215.  Reed, in violation of Title IX, discriminated against John based on his sex and, as

a result, John has been seriously and irreparably damaged.  Regardless of his guilt or innocence,

the severity of the penalty—expulsion—and the decision to initiate the proceeding, were affected

by John's gender.

216.  Reed discriminatorily investigated, charged, and disciplined only John—the

male—in connection with a sexual encounter involving John and two females, despite the fact

that all three engaged in materially identical behavior.

217.  Reed did not investigate, charge, or discipline AM (a female), who played a more

active role than John in the sexual encounter, despite Jane's allegations that AM initiated the

sexual activity and did not secure Jane's consent, and despite Granger's Investigative Report that

reached the same conclusion.

218.  Reed did not investigate, charge, or discipline Jane or AM for their sexual activity

with each other or their sexual activity with John, despite the fact that Jane, AM, and John had

all ingested approximately the same volume of intoxicants and shared substantially the same

capacity to consent to that activity.

219.  Reed did not discipline Jane for the incident of dating violence—when she

punched John in the face, causing bleeding and loose teeth.

220.  Reed did not discipline the female student who sexually assaulted John despite

clear evidence of the assault.  Moreover, Granger strongly discouraged John from bringing

formal charges.

PAGE 41 – COMPLAINT

221.  Upon information and belief, Reed has never taken action against a female student for making a false allegation of the kind involved in this matter.

222.  Upon information and belief, during the tenures of President Kroger and Granger, males invariably lose when charged with sexual misconduct at Reed.

223.  As a direct and proximate consequence of Reed's Title IX violation, John has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly reflects that he was found to have committed sexual misconduct, harassment and/or other related offenses.

224.  This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for serious misconduct that he did not commit.

225.  John has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

226.  As a direct and proximate consequence of Reed's Title IX violation, John has lost any and all monies he paid to obtain a Reed degree (including, but not limited to, tuition, living expenses, books, and transportation costs) since he enrolled in approximately September 2010, as he was forced to leave Reed without obtaining a degree.

227.  John is entitled to recover damages for Reed's Title IX violation, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief.

### Count 2 - Erroneous Outcome from a Flawed Proceeding

228.  In violation of Title IX, Reed discriminated against John based solely on his gender and, as a result, seriously and irreparably damaged him.  It discriminated against him by

failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-ordained result, due to his gender and gender stereotypes.

229.  Reed created an environment in which John, an accused male student, was so fundamentally denied due process as to be virtually assured a finding of guilt.  Such a biased and one-sided process deprived John, as a male student, of educational opportunities on the basis of sex.

230.  Reed conducted its "investigation" and subsequent SMB hearing, in which a majority of the hearing members were students, in a manner that was biased against the accused, John, based on gender.  From the outset, the investigation and adjudication process was slanted in favor of Jane, the female accuser, because of her gender.  The SMB and President Kroger accepted her statements at face value and granted her the presumption of truth because she is female.  John did not have an equal opportunity to present relevant witnesses and to present evidence about Jane's motives to present false accusations.  John was also given less time to prepare, based on his gender.  The SMB was improperly trained and was insufficient under Title IX.

231.  Reed responded to Jane's accusations with a series of arbitrary, capricious, discriminatory, and gender-based actions directed toward a predetermined outcome: John's expulsion from Reed.  In this process, Reed failed to adhere to its stated processes and procedures.  Among other things, Reed (1) improperly instructed John that he was forbidden from contacting witnesses prior to his hearing, leaving him to rely entirely on the SMB to reach out to those witnesses to ensure their attendance; (2) failed to ensure that critical witnesses attended; (3) refused to ask critical questions that related to Jane's motive and credibility; and (4) considered matters on appeal in President Kroger's final review to justify upholding the decision

PAGE 43 – COMPLAINT

that were at odds with the SMB's previous determination that such matters did not warrant

expulsion, and that were considered for the first time in the final appeal.

232.  Reed also contributed to an erroneous outcome through the following:

a.  Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

b.  Violating Reed's policy against gender/sex-based discrimination by establishing a *de facto* presumption, on the basis of gender stereotypes, that John committed sexual assault;

c.  Conducting a cursory, superficial, biased, and fundamentally unfair investigation, hearing, and appeals process;

d.  Failing to notify John of the allegations against him in the prescribed timeframe;

e.  Causing a superficial, conclusory, and capricious "Investigative Report" to be created, which impermissibly contained opinion, mischaracterized witness testimony, and excluded pertinent information, and which was clearly biased in favor of the accuser;

f.  Failing to adequately and impartially investigate the allegations against John by, *inter alia*, discounting or ignoring crucial witness testimony, including the testimony of AM, the third participant in the July 25, 2013 sexual encounter;

g.  Failing to provide sufficient time for John and the SMB to prepare for the hearing;

h.  Failing to ensure that the SMB members were properly trained and prepared to adjudicate a sexual assault allegation;

i.  Failing to properly apply a "reasonable person" standard or a "preponderance of the evidence" standard at the hearing;

j.  Preventing John from contacting favorable witnesses and failing to ensure their attendance at the hearing;

k.  Failing to allow John to present a defense of his choosing by, *inter alia*, cutting off his direct testimony, denying his request to present certain witnesses, and denying him the opportunity to cross-examine or confront witnesses;

l.  Failing to provide John with basic due process, including the opportunity to confront—at least indirectly—Jane with questions to test her veracity and credibility and explore her motivations for bringing her complaint;

m.  Considering the superficial, biased, and conclusory Investigative Report during the SMB hearing and on appeal;

n.  Rendering an adverse decision against John without sufficient evidence to support such a decision;

PAGE 44 – COMPLAINT

o. Permitting Jane 60 days to respond to the evidence John submitted on appeal without allowing John a remotely equivalent period to present evidence or arguments at any stage of the proceedings;

p. Affirming the SMB's findings and sanctions despite Jane's complete and utter failure to refute the sworn eyewitness testimony of AM and ML, which corroborated John's account of the events of July 25, 2013 in every material respect;

q. Rendering a decision on appeal that relied on information that John was precluded from discussing during the SMB hearing after the SMB determined that such information was "not 'relevant'";

r. Failing to impose a proportionate and reasonable sanction; and

s. Issuing an arbitrary and capricious appellate decision.

233. But for the obvious gender bias, the outcome of the proceeding would have been different. As a direct result of its flawed proceeding, John was denied a fundamentally fair hearing and the SMB reached an erroneous outcome.

234. As a direct and proximate consequence of Reed's Title IX violation, John has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly reflects that he was found to have committed sexual misconduct, harassment, and/or other related offenses.

235. This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for serious misconduct that he did not commit.

236. John has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

237. As a direct and proximate consequence of Reed's Title IX violation, John has lost any and all monies he paid to obtain a Reed degree (including, but not limited to, tuition, living expenses, books, and transportation costs) since he enrolled in approximately September 2010, as he was forced to leave Reed without obtaining a degree.

PAGE 45 – COMPLAINT

238.  John is entitled to recover damages for Reed's Title IX violation, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief, as directed by the Court.

### Count 3 - Deliberate Indifference

239.  Reed, in violation of Title IX, demonstrated a deliberate and systematic indifference to the harassment of John due to his gender.

240.  Reed and, in particular, Granger, had actual notice that John was the victim of sexual assault while a student at Reed.  However, when John reported the allegations of sexual assault to Granger, Granger interrogated John like he was the assailant, rather than victim, because John is male.  Moreover, Granger persuaded John to *not* pursue any formal charges against his female assailant.  This stands in sharp contrast to Granger's active encouragement of Jane to file her formal complaint against John as soon as possible.  Granger also did not ensure the attendance of Dean Frost or a similarly situated member of the administration at the meeting, as he did with Jane.

241.  Reed, and in particular Granger, also had actual notice that John was the victim of physical assault and dating violence while a student at Reed.  Jane admitted to Granger that she had punched John in the face, causing bleeding and knocking two teeth loose.  However, despite her admission, Granger did not institute any disciplinary proceedings against Jane or sanction her in any way, nor did he encourage John to file a complaint.  Instead, Granger imposed a *mutual* no-contact order, requiring John to also stay away from Jane and subjecting John, the victim, to disciplinary sanctions should Jane, his female abuser, report (or fabricate) a future violation of the no-contact order.

242.  John is the victim of false allegations by his female abuser, Jane, but Reed, once

PAGE 46 – COMPLAINT

again, has failed to take any action to protect John.

243.  President Kroger also had notice, during the appeals process, of the defective hearing in this case but failed to correct the misconduct.

244.  Reed's actions—and inaction—were unreasonable in light of the known circumstances.  Reed has been and continues to be deliberately indifferent to John's harassment about which it has knowledge, because John is a male being harassed by female students.  Reed's indifference is underscored by its plan to confer a degree on Jane at its graduation ceremony in spring 2015.

245.  As a direct and proximate consequence of Reed's Title IX violations, John has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) that improperly reflects that he was found to have committed sexual misconduct, harassment, and/or other related offenses.

246.  This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for serious misconduct that he did not commit.

247.  John has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

248.  As a direct and proximate consequence of Reed's Title IX violations, John has lost any and all monies he paid to obtain a Reed degree (including, but not limited to, tuition, living expenses, books, and transportation costs) since he enrolled in approximately September 2010, as he was forced to leave Reed without obtaining a degree.

249.  John is entitled to recover damages for Reed's Title IX violations, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

PAGE 47 – COMPLAINT

disbursements, and appropriate equitable relief, as directed by the Court.

### Second Cause of Action

**Breach of Contract**
**(Against Defendant Reed)**

250.  John Doe incorporates and realleges paragraphs 1 through 249 as if set forth fully herein.

251.  At all times material hereto, a contractual relationship existed between Reed and John.  The Guidebook and the other related policies, procedures, and promises governing situations such as this one, the terms of which were unilaterally promulgated by Reed, comprise the contract.  Pursuant thereto, Reed was required to act in accordance with the Guidebook and other applicable policies in resolving complaints of misconduct and alleged violations of the honor principle in the investigation of those complaints, in the process of adjudicating complaints of sexual misconduct, and in resolving appeals brought to challenge disciplinary decisions.

252.  The promises set forth in the Guidebook and other Reed policies are and were supported by valid consideration.

253.  John fully complied with all of his contractual obligations to Reed, including payment of annual tuition and compliance with enrollment procedures.

254.  Based on the aforementioned facts and circumstances, Reed materially breached its contractual obligations to John by, among other things:

    a.  Discriminating against John on the basis of his gender;

    b.  Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

    c.  Violating Reed's policy against gender/sex-based discrimination by establishing a *de facto* presumption, on the basis of gender stereotypes, that John committed sexual assault;

PAGE 48 – COMPLAINT

d.  Conducting a cursory, superficial, biased, and fundamentally unfair investigation, hearing and appeals process;

e.  Failing to notify John of the allegations against him in the prescribed timeframe;

f.  Causing a superficial, conclusory, and capricious "Investigative Report" to be created, which impermissibly contains opinion, mischaracterizes witness testimony, and excludes pertinent information, and which was clearly biased in favor of the accuser;

g.  Failing to adequately and impartially investigate the allegations against John by, *inter alia*, discounting or ignoring crucial witness testimony, including the testimony of AM, the third participant in the July 25, 2013 sexual encounter;

h.  Failing to provide sufficient time for John and the SMB to prepare for the hearing;

i.  Failing to ensure that the SMB members were properly trained and prepared to adjudicate a sexual assault allegation;

j.  Failing properly to apply a "reasonable person" standard or a "preponderance of the evidence" standard at the hearing;

k.  Preventing John from contacting favorable witnesses and failing to ensure their attendance at the hearing;

l.  Failing to allow John to present a defense of his choosing by, *inter alia*, cutting off his direct testimony, denying his request to present certain witnesses, and denying him the opportunity to cross-examine or confront witnesses;

m.  Failing to provide John with basic due process, including the opportunity to confront and question Jane to test her veracity and credibility and explore her motivations for bringing her complaint;

n.  Considering the superficial, biased, and conclusory Investigative Report during the SMB hearing and on appeal;

o.  Rendering an adverse decision against John without sufficient evidence to support such a decision;

p.  Permitting Jane 60 days to respond to the evidence John submitted on appeal;

q.  Affirming the SMB's findings and sanctions despite Jane's complete and utter failure to refute the sworn eyewitness testimony of AM and ML, which corroborated John's account of the events of July 25, 2013 in every material respect;

r.  Rendering a decision on appeal that relied on information that John was precluded from discussing during the SMB hearing after the SMB determined that such information was "irrelevant";

s.  Failing to impose a proportionate and reasonable sanction;

t.  Issuing an arbitrary and capricious appellate decision; and

PAGE 49 – COMPLAINT

u.   Failing to protect John from physical harm from Jane.

255.  As a direct, proximate, and foreseeable consequence of these breaches, John sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages.

### Third Cause of Action

### Breach of Covenant of Good Faith and Fair Dealing
### (Against Defendant Reed)

256.  John Doe incorporates and realleges paragraphs 1 through 255 as if set forth fully herein.

257.  The contract between Reed and John imposed upon Reed a duty of good faith and fair dealing including, *inter alia*, a duty to conduct a diligent, unbiased, and meaningful investigation, adjudication, and appellate review according to Reed's Guidebook and other policies.

258.  Reed breached and violated the covenant of good faith and fair dealing implied in its agreement with John by failing to conduct a diligent, unbiased, and meaningful investigation, adjudication and appellate review.

259.  Reed also breached its implied covenant of good faith and fair dealing by, among other things, engaging in the conduct described in paragraph 253, above.

260.  As a direct, proximate, and foreseeable consequence of these breaches, John sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages.  John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, and appropriate equitable relief, as directed by the Court.

PAGE 50 – COMPLAINT

## Fourth Cause of Action

### Unfair or Deceptive Trade Practices
### (Against Defendant Reed)

261.  John Doe incorporates and realleges paragraphs 1 through 260 as if set forth fully herein.

262.  The Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.* ("UTPA") prohibits unfair and deceptive acts and practices in commerce.

263.  Deceptive advertising and marketing, including the misrepresentation of facts and the omission of material facts, violates the UTPA's prohibition on unfair and deceptive acts and practices in commerce.  Under the UTPA, a representation is a manifestation of an assertion by words or conduct, including a failure to disclose a fact.  Actionable representations under the UTPA can be express or implied.

264.  Reed willfully engaged in the following unconscionable and deceptive acts and practices, aimed at the consumer public at large, which included representations and/or omissions that were likely to mislead a reasonable consumer acting reasonably under the circumstances:

    a.  Causing John to believe that Reed would adhere to and follow the policies and procedures set forth in its Guidebook and elsewhere when conducting its investigation, adjudication, and appeal relating to Jane's allegations; and

    b.  Causing John to believe that, if he and his family paid the required tuition and fees, Reed would honor the promises, obligations, covenants, and warranties it made to John in the Guidebook and elsewhere.

265.  Based on the foregoing facts and circumstances, Reed engaged in unfair and deceptive trade practices in violation of ORS 646.607 and ORS 646.608.

266.  As a direct, proximate, and foreseeable consequence of Reed's deceptive acts and practices, John suffered an ascertainable loss of money and property including, without limitation, loss of educational opportunities, economic injuries, and other direct and

consequential damages.  John is entitled to damages in an amount to be determined at trial, plus

prejudgment interest, attorneys' fees and costs, punitive damages, and appropriate equitable

relief, as directed by the Court.

### Fifth Cause of Action

### Declaratory Judgment
### (Against Defendant Reed)

267.  John incorporates and realleges paragraphs 1 through 266 as if set forth fully

herein.

268.  Reed committed numerous violations of its contract with John and of federal and

state law.

269.  John's education and future career have been severely damaged.  Without

appropriate redress, the unfair outcome of the SMB hearing and its appeal will continue to cause

irreparable harm to John.

270.  As a result of the foregoing, there exists a justiciable controversy between the

parties with respect to the outcome, permanency, and future handling of John's formal student

record at Reed.

271.  By reason of the foregoing, John requests, pursuant to 28 U.S.C. § 2201, a

declaration that: (i) the outcome and findings made by Reed at the SMB hearing be reversed; (ii)

John's disciplinary record be expunged; (iii) the record of John's expulsion from Reed be

removed; (iv) any record of John's SMB hearing be permanently destroyed; and (v) Reed's rules,

regulations, and guidelines are unlawful as applied.

### Sixth Cause of Action

### Defamation
### (Against All Defendants)

272.  John incorporates and realleges paragraphs 1 through 271 as if fully set forth fully

herein.

273. Reed and Jane each made communications about John that were defamatory in nature.

274. Specifically, each published to third parties—orally and in writing—that John was the perpetrator of a sexual assault, even though they knew the allegation was false, or acted with reckless indifference to the truth or falsity of said allegation.

275. The defamatory communications tended to harm and did harm John's reputation so as to lower him in the estimation of the community and to deter third persons from associating with him.

276. The defamatory communications were intended to, and did, convey to third persons John's guilt of a serious sexual criminal offense involving moral turpitude.

277. Reed and Jane intended not only to deprive John of his good name and to bring him into scandal and disrepute amongst his neighbors and peers, but also to limit John's future educational and employment prospects.

278. The defamatory communications tended to, and did, blacken John's reputation and expose him to public hatred, contempt, and ridicule.

279. The allegations against John were directly and clearly disputed by independent third parties, and were otherwise so inherently improbable that only a reckless and dishonest person would have conveyed them.

280. The defamatory communications were not statements of mere opinion.

281. The defamatory communications were published in that they were made to numerous third parties. The defamatory communications included, but were not limited to: Jane's statements to Gary Granger and Dean Frost on or about March 11, 2014, and her

PAGE 53 – COMPLAINT

statements to the SMB on or about April 4, 2014; Jane's similar statements to numerous of John's fellow Reed students, peers, and professors throughout 2014; and the SMB's publication of its "Finding of Fact," "Sanctions," and "Justification of Sanctions" to Jane and Reed's Dean of Students, Mike Brody, in or about May 2014.

282.   The defamatory communications were malicious, reckless, and intentionally or negligently made.

283.   The defamatory communications were not justifiably protected by any privilege; or, in the alternative, if they were protected by a privilege, it was abused.

284.   The defamatory communications referenced John by name to ensure that those who received the communications knew that they referred and applied to John, and the recipients of the defamatory communications understood that they applied to John.

285.   All persons receiving the communications understood the defamatory meaning of the communications.  All persons receiving the communications believed John had committed a serious criminal offense involving sexual misconduct—sexual assault—against Jane.

286.   John was specially harmed by the publication of the defamatory communications.

287.   As a result of the publication of the defamatory communications, John suffered actual loss to his reputation and personal humiliation and anguish.

288.   As a direct and proximate result of the defamatory communications, John sustained substantial damages, including, but not limited to, loss of educational opportunities, economic injuries, and other direct and consequential damages.  John is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

289.   Defendants' conduct was wanton, reckless, willful, malicious, and oppressive, and demonstrated reckless indifference to John's rights and interests so as to warrant an award of

PAGE 54 – COMPLAINT

punitive damages.

### Seventh Cause of Action

#### Abuse of Process
#### (Against Defendant Jane Roe)

290.   John incorporates and realleges paragraphs 1 through 208 as if fully set forth fully

herein.

291.   Jane, acting willfully, without probable cause and with malice, filed a false report

with Reed, claiming, among other falsehoods, that John had sexually assaulted her.

292.   Jane perverted the SMB process to accomplish the ulterior purpose of retaliating

against John for ending his relationship with Jane and for dating Jane's friend.

293.   As a result of the defamatory, false, and embarrassing allegations contained in

Jane's report, John sustained substantial damages, including, but not limited to, loss of education

opportunities, economic injuries, and other direct and consequential damages.

294.   As a result of the foregoing, John is entitled to damages in an amount to be

determined at trial, plus prejudgment interest.

295.   Jane's conduct was wanton, reckless, willful, malicious, and oppressive, and

demonstrated reckless indifference to John's rights and interests so as to warrant an award of

punitive damages.

### Eighth Cause of Action

#### Intentional Interference with Contractual Relations
#### (Against Defendant Jane Roe)

296.     John incorporates and realleges paragraphs 1 through 208 and 290 through 295 as

if fully set forth fully herein.

297.     John has the right to pursue his contractual relationships free from interference on

the part of other persons.

PAGE 55 – COMPLAINT

298.    Jane had knowledge of John's contractual relationship with Reed.

299.    At all times material hereto, Jane did willfully, maliciously, and improperly interfere with an existing contract between John and Reed by repeatedly meeting with Reed agents, servants, and/or employees, and defaming John and leveling false accusations against him that resulted in his expulsion and exclusion from Reed.

300.    Jane's accusations against John to Reed were defamatory, brought in bad faith, and intended to retaliate against John for dating her friend or ending their relationship, rather than to vindicate legitimate or honest concerns.

301.    Jane had no privilege, justification, or legitimate interest for interfering with the contract between John and Reed.

302.    Jane, who, in the pursuit of her improper objective, intentionally and improperly interfered with the performance of this contract, is subject to liability.

303.    In intentionally accusing John of sexual assault and dating violence, Jane was giving false and defamatory information to Reed which Jane knew to be false.  As a direct and proximate result of Jane's intentional interference of contract, John suffered expulsion and exclusion from Reed, and financial harm stemming therefrom.

304.    Jane's conduct was wanton, reckless, willful, malicious and oppressive, and demonstrated reckless indifference to the rights and interests of John so as to warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, John Doe, demands that judgment be entered in his favor and against Defendants, for the following relief:

(a) Order Reed to correct John Doe's academic and disciplinary record to remove any

PAGE 56 – COMPLAINT

findings issued by Reed with respect to the charges leveled against him by Reed and/or
Jane;

(b) Order Reed to verify this correction by providing John with a notarized letter confirming
that any findings with respect to these charges have been expunged from John's academic
and disciplinary record;

(c) Order Reed immediately to allow John to reenroll at Reed to complete his degree
requirements;

(d) Issue a declaration that:

     (i)     the outcome and findings made by Reed College at the Sexual
          Misconduct Board hearing be reversed;

     (ii)    John Doe's disciplinary record be expunged;

     (iii)   the record of John Doe's expulsion from Reed College be removed;

     (iv)   any record of John Doe's Sexual Misconduct Board hearing be
          permanently destroyed; and

     (v)    Reed College's rules, regulations, and guidelines are unlawful as
          applied.

(e) Award John Doe compensatory damages in an amount to be proven at trial, in addition to
prejudgment interest, punitive damages, attorneys' fees, expenses and costs; and

(f) Such other relief that the Court deems just and proper under the circumstances.

DATED this 14th day of April, 2015.       ANGELI UNGAR LAW GROUP LLC

                                      By:    s/ David Angeli
                                              David H. Angeli, OSB #020244
                                              Kristen L. Tranetzki, OSB #115730
                                              Telephone: (503) 954-2232

PAGE 57 – COMPLAINT

BUCHANAN   ANGELI   ALTSCHUL   &
SULLIVAN LLP

Courtney W. Angeli, OSB #941765
Robin Bowerfind, OSB #035949
Telephone: (503) 974-5015

Attorneys for Plaintiff John Doe